UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

AMERICA'S WHOLESALE LENDER, INC.     )   CIVIL ACTION
                                                                          )   No. 3:11-cv-1493 (CFD)(TPS)
   Nominal Plaintiff,                                )
                                                                          )   US DISTRICT COURT
vs.                                                                      )   T.P. SMITH, J.
                                                                          )
MAURICE VAN ECK,                             )
   Defendant                                           )   OCTOBER 04, 2011
_____ )

## MOTION TO DISMISS

The Defendant in the above-captioned civil action hereby respectfully
Motions this Court to Dismiss this civil action on the grounds that the Court
[United States District Court for the District of Connecticut] has no jurisdiction
over the persons or the subject matter.  Notwithstanding the vast mounds of
paper with which counsel McKessy has graced this Court, there is absolutely
nothing to suggest that Connecticut has any nexus to the case.

This Motion is addressed to Magistrate Judge Thomas P. Smith insofar as
Judge Smith appears to have been assigned, at least in initial stages, the
responsibility for this matter.

**A.     REFERENCED MATTERS and nomenclature.**

1.     Herein, paragraphs referenced by brackets **C. ( )** reference the
equivalent paragraphs in the nominal Plaintiff's "Verified Complaint."

2.     Other references are recited by shortened name versions as
customarily used in the Courts of the United States: e.g. "*McKessy Declaration*"
as abbreviated version for a reference in the document formally titled

1

"*Declaration of Scott S. McKessy in Support of Preliminary Relief.*" The
shortened version is intended solely to reduce verbiage.

## B.    THE CONTROVERSY AS TO VENUE

3.    The "Verified Complaint" (apparently over the signature of Scott S.
McKessy, Esq.) recites that the nominal Plaintiff is "a New York Corporation"
[see: **C.** at (4)].

4.    The *Complaint* recites that "Venue is proper in this District under
28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving
rise to the claims alleged occurred in this District." [ **C.** at (3)].    Other than this
bald allegation, for which no substantiation is proffered, there is *zero* to connect
this District to the events complained of.

5.    More particularly, commencing at **C.(6),** Plaintiff  relates to property
in Yorba Linda, California [hereinafter "Burk" or "Burk property"].

6.    At **C.(7)**, a recitation is made of someone named "Attorney Paul
Nguyen" of "Global Capital Law, P.C."   Nyguyen and Global Capital are both of
Los Angeles, California metro area.

7.    At **C.(8)**, a recitation is made of a lawsuit in California.

8.    The Complaint at **C.(9)** through **C.(11)** references further events in
California.

9.    The Complaint at **C.(12)** references the "City National Bank."
While the *Complaint* carefully omits the location, referencing the Bell Declaration
[of September 27, 2011] at Exhibit "B", the address is found to be at 423 Ferry

2

Street, Metropolis, Illinois. Some explanation is in order here, and to clarify for the Court: Dennis Bell (Declarant referenced) turns out to be a machinist with zero experience in mortgage servicing or the financial industry. He resides in and about McCracken County, Kentucky, of which the largest community is Paducah. "Metropolis" is a tiny fly-speck of a community that lies across the Mississippi River from Paducah, in far-downstate Illinois. See: Google Map at **Exhibit 1**. Metropolis consists of only 1,708 families. See: Wikkipedia at **Exhibit 1**. The total population of the 1,.708 families is 6,482 (dogs and cows not included). The City National bank, despite its grandiose name, is a fly-speck bank with no branches outside Metropolis, Illinois. The undivided profits of the Bank are but $400,000. The average size of deposit account is but $24. See: **Exhibit 2**. The main advantage of this "bank" as what counsel McKessy refers to as "AWL's general corporate bank account" [**C.(12)**] seems to be that it is outside the jurisdiction of both the State of New York and the State of Kentucky, and thus not attachable by creditors or State authorities, assuming that they were ever to find out about Bell's personal piggy-bank. The "bank" also does not much have the sophistication to sense any of Bells improprieties (more on that later herein).

10.     The Court is thus confronted with the spectacle of what is represented to be this major New York financial lending institution, "America's Wholesale Lender, Inc.," operating out of a tiny micro-bank in a fly-speck town in downstate Illinois.

11.     At **C.(14)**, the Complaint references "Western Resources Title Co.," Nguyen, and Global Capital. These are California entities .

3

12.   At **C.(15),** the Complaint references some entity described as "Chase Meritt Fund I, LLC" [*sic*]. Yet the Bell Declaration at Exhibit J sets forth the proposition that "Chase Merritt Fund I L.L.C." is a Nevada business entity bearing Nevada Business ID NV20111227303, an entity with no stock records, no Officers listed, and with Paul Nguyen as "manager." The address reflects the city of Las Vegas, NV. It should be noted that "Nguyen" is as common in Vietnamese as Smith is to English; the actual identity of "Nguyen" is speculative.

13.   At **C.(16)**, the verified Complaint over the signature of McKessy sets forth the allegation that "as a result of the altered escrow instructions, the amount of $260,000.00 was diverted to Chase Meritt Fund I, LLC, not to City National Bank." Astonishingly, this is belied by perusal of Exhibit "D" of the Bell *Declaration*, wherein it appears that the funds in controversy flowed directly by cashier's check from Burk to Chase Merritt, and no funds as complained of passed through the escrow as alleged. It would appear that McKessy drafted both the *Complaint* and the Bell *Declaration*; nonetheless, he makes this representation to the Court. The representation is materially misleading.

14.   The events referenced in **C.(16),** which did not even occur, would otherwise not be in Connecticut, but in California.

15.   At **C.(17)**, the allegations of "Officers" of "Chase Merritt," while speculation, would reference individuals of *California* and an entity in *Nevada*.

16.   At **C.(19)**, the Complaint references an event that has not occurred.

17.   At **C.(20)**, the Complaint references individuals apparently in California, Nevada or New Mexico.

4

18. At **C.(21)**, the Complaint references discussions in *California*.

19. At **C.(22)**, the Complaint references further conversations in California, and recited the TD Bank. TD Bank is a *New York* bank.

20. At **C.(23)**, the Complaint sets forth the proposition that the Company has no New York bank. While absurd, nonetheless the paragraph relates to a "New York" entity and a "New York" bank.

21. At **C.(24)**, the deteriorated mental state of Bell becomes apparent. Bell, in his long slide into a paranoid state of insanity, sets forth delusions. Attorney McKessy, an experienced and seasoned counsel, should be ashamed of himself for setting his signature to such rubbish.

21. At **C.(26 - 49)**, the Complaint continues to set forth events that apparently took place in New York City, to the extent that this Court might ascribe any credibility to the representations made therein.

22. In the following Counts One through Four, inclusive, of the "verified" Complaint, see at **C.(50-66)**, no suggestion is made that any of the acts complained of or causes of action as alleged actually took place within Connecticut. Indeed, the entire Complaint inclusive from cover to cover is remarkably devoid of any mention of Connecticut, other than the bald allegation in paragraph 3 [that "a substantial part of the events or omissions giving rise to the claims alleged occurred in this District."].

23. The Complaint, on its face, fails to set forth any basis for this Court to entertain jurisdiction over either the defendant or the subject matter as set forth therein, and thus should properly be dismissed with prejudice.

24.    Additionally, the gravamen of the Complaint seems to set forth that property of America's Wholesale Lender, Inc. was stolen by the Defendant. The Court's attention is directed towards the allegations specifically recited at *Complaint,* , which is repeated verbatim as:

"  (56). In particular, the defendant has stolen the payment in the amount of $260,000 which is the property of AWL."    **C.(56).**

Throughout the *Complaint,* the recitation is made of the "theft" or "stolen payment" as specified in § 56. The Court's attention is directed to Exhibit "D" of the Bell *Declaration.* The cashier's check drawn on Bank of America [No. 431735171] on its face is issued by "Linda Marie Burk" as Remitter and made payable to "Chase Merritt Fund I, LLC" as Payee. There is no evidence that these funds ever were in the possession of, or passed through the hands of, either the Plaintiff or the Defendant herein. No Indorsement has been proffered to suggest otherwise. It appears that someone, not identified, made a hand-written notation on the face of the check under circumstances that are not known and with no allegations as to such circumstances made by this Plaintiff. There is no suggestion, nor could there be any foundation for any representation, that the existence of this Instrument would inure to the benefit of Defendant, or for that matter anybody other than the stated payee thereon.

25.    Inasmuch as there is zero evidence that the funds recited in **C.(56)** et. al. ever flowed through, or were in the possession of, any Officer or Bank Account of Plaintiff, or Defendant, and the Instrument is neither made out to the Order of nor Indorsed to the Plaintiff, the suggestion that Plaintiff has had this

6

payment "stolen" from it by the Defendant is without foundation. Indeed, on its face there is no inference that any theft of anything has taken place.

## C. THE CONTROVERSY AS TO JURISDICTION

24. Other than the bald assertion that Defendant is "residing" in Connecticut, the Plaintiff makes no other claim and indeed does not address the matter further. The Complaint is utterly bereft of any specificity as to any nexus by any of the Parties to this State.

25. Indeed, the Plaintiff's supporting documentation points in another direction. More particularly, the Bell Declaration recounts that Defendant was hired in New York. See: at para. 4. More particularly, in his diatribe of September 30, 2011 at 6:22 p.m., wherein he consistently references "stolen" and "criminal," Bell announces (responsive to complaints that Bell has not met salary payments) :

" I'm pretty sure the **State of New York** will not require that I pay you for that [back pay]." [emphasis added].

**Exhibit "3",** Bell e-mail 9.30.11, pg. 2, line 2-3.

26. Conspicuously, counsel McKessey at his partnership office e-mail address mckessy@halloran-sage.com was directly informed of Bell's assertion that Defendant was a New York employee.

27. Accordingly, it becomes difficult to discern how the Complaint would establish on its face that this Court would entertain Jurisdiction over the persons, as the test of diversity does not seem to have been set forth with

sufficient specificity, or indeed any specificity, to meet the requirements of Statute. The Complaint seems to reference incidents in California and persons in New York, and the nominal named Plaintiff is admitted as a New York Corporation.

## D. AS RESPECTS "GEORGE TOMAS."

28. The Court's attention is directed towards the suggestion, made or implied in Pleadings signed by counsel McKessy for the nominal Plaintiff, that there is a "George Tomas" within the controversy, or in the alternative that the Defendant is representing himself to the community at large as "George Tomas." The representations by counsel McKessy are untruthful.

29. During the course when Defendant as Company Officer was investigating the matters surrounding the _Burk_ issues, a number of electronic-mail or "e-mail" memos were erased, both from the Company and from the account of Attorney Diane Beall. _See_, **Exhibit "4".** It had to be anticipated that the e-mail discussions between Defendant and Dennis Bell (the plaintiff's alter-ego and the real plaintiff advancing this litigation) were exposed to "hacking," where the e-mail accounts were electronically entered.

30. Accordingly, Bell instructed Defendant to establish a "back-door" e-mail channel known only to themselves. Specifically to avoid the possibility of "hacking" and compromise of this channel, pseudonyms were assigned, "George Tomas" and "oneoutback." The "oneoutback" pseudonym was previously used by Bell outside the Company. Within the Company, Bell was

8

known for using the pseudonym "massone99." Presumably "massone99" was

exposed to electronic "hacking." Bell's use of pseudonyms was consistent;

indeed, Bell was never known to use his own name.

31.     The recitation of "back door" e-mail channel was re-emphasized

and is found in Plaintiff's Bell Declaration, Exhibit "G", pg. 2, last paragraph.

More particularly:

"     You have to assume that these clowns are technically sharp. That
fellow Brian apparently was involved in selling stocks, including an IPO from
some Israeli tech company that he was involved in. Israel is notorious for internet
chicanery. You have to assume that whatever Internet channel you were using
to correspond with either of them, are now compromised, and may have
"cookies" or whatever planted in your software. In an abundance of caution only
email channels that they do not know about can be used for non-routine traffic.
At this point there is every reason to be conservative. "
                                        Bell *Declaration*, Exh. "G", pg. 2.

32.     A generically Hispanic name was randomly chosen as there are no

apparent Hispanic males working for the Company. Taken together with the "one

out back" pseudonym adopted by Bell, the chances of this particular e-mail pair

being electronically identified and "hacked" appeared remote.

33.     At no time was "Tomas" used outside this specific back-door

channel. It was carefully guarded specifically to remain undiscovered by

outsiders.

34.     The above is perfectly well known to counsel McKessy and he is to

be roundly rebuked for perpetrating a charade upon the Court, and by his

wrongful actions he has wrongfully convinced this Court to allow him to take pre-

judgment remedies upon any person in the United States with the name "George

Tomas," an entirely common Hispanic name.

## E.    AS TO THE CREDIBILITY OF DENNIS BELL, DECLARANT

35.    Dennis Bell, apparently a resident of McCracken County, Kentucky,
a person with no previous background in the financial-services industry, appears
to have taken control of the Company. Bell intends to remove all Company funds
to his micro-bank in downstate Illinois and render the Company insolvent to
creditors. His past pattern and practice has been to treat the Company funds as
his own, and he helps himself to "insider deals" to float whatever other operation
he may be involved in. Bell is known to be operating a failing trucking enterprise
with a fleet of decrepit trucks, one of a sorry sequence of failed Bell projects. Bell
has apparently put his girlfriend on the Board of Directors of the Company,
notwithstanding that she is utterly unqualified as to business matters and has no
clue. The "Board" seems to consist of Bell, his girlfriend, and one of his truck
drivers. The credibility of the Director girlfriend [Cheri English] (who seems to
appear consistently as owner, Director, or Officer of Bell's various incorporations)
is best expressed in English's own words, reproduced at **Exhibit "12"** . Therein,
the salient achievements are recited as having one child by Mr. Dunn at age 21
and another by "Mr. T." at age 30, and having attended elementary school. How
this qualifies to sit on several corporate Boards and be Director of various
companies remains unexplained.

36.    Dennis Bell has a long and disconcerting history of embroilments
with banks who have sued him. Within the Commonwealth of Kentucky alone, a
plurality of cases were consolidated by the Courts into *Countrywide Home Loans,*

10

*Inc. v. Dennis L. Bell*, McCracken Circuit Court, Div. 2, Consol. Case No. 06-CL-00305. At one point within that Docket, Bell faced the bank's Motion for Contempt with a request for imprisonment as punishment for criminal contempt, and recites further therein that the Court "should consider doing the same with regard to Ms. Cheri English," Bell's erstwhile girlfriend. (*Motion for Sanctions*, March 2010). Bell has further been sued in *Commerce Bank N.A. v. Dennis Bell*, Circuit Court of McCracken County, Div. 1, Docket No. 10-CI-197.

37.    At one point Bell moved his assets into an apparent "trust" styled apparently as the "Emerald Bay Revocable Trust" and appointed his girlfriend as Trustee of the trust, notwithstanding her utter inability to administer the trust. The "Trust" was moved across the Mississippi River to place it outside the reach of both State and Federal Courts sited in Kentucky. Bell through English then filed Petitions in Bankruptcy for himself (within Kentucky, as *In re Bell*, U.S. Bankr. Ct., W. D. Kentucky (Paducah), 10-50501 (THF), commenced April 21, 2010), and for the Trust, conveniently before the Bankruptcy Court in Illinois. *In re: Emerald Bay Revocable Trust*, U.S. Bankr. Ct. S.D. Illinois (Benton), # 10-40457-lkg.   The Court's attention is directed to a copy of the Docket Sheet, schedules, and Trial Transcript of November 03, 2010 before Judge Meyers. *See*: Def. **Exhibit "8", "9", "10", and "11"**.

Bell was present and addressed the Court.

38.    The frustration of the Meyers Court was evident in remarks recorded on Page 4, line 7ff:

------------------------------------------------

11

**THE COURT**: [directing remarks to Bell]: See, that's a stupid argument.
... Let me tell you why it's a stupid argument. ... You invoked the jurisdiction of
this Court when you filed the pleadings in this Court. That's where the Court gets
jurisdiction."

**MR. BELL**: .....But BAC Home Loan Servicing Inc.--

**THE COURT**: No, no, no, no. We're not going to go there. We've been
there. We rode that pony as long as we're going to ride it. .....The Court rejected
that issue. "

(continuing) Now, both of those arguments -- let me tell you what, I think
**they're specious -- they're just not believable**.

And further, on page 7 of the *Transcript*::

**THE COURT**: I've been doing this work for 35 years, and I can tell you
what happens is **you're wanting to confuse this thing**, and it would be a
**morass** when you get done with it, and I'm going to be no part of it. You've had
your opportunity to speak. You've been in this court before. You've made your
arguments. Those **arguments were rejected**. We're not going to go back down
that path again. "                                                  {emphasis added.} **Tr., Exh. 9**.

-----------------------------------------------

38.     The Trust Bankruptcy Petition was Dismissed subsequent to
*Motion to Dismiss Case* filed by creditor BAC Home Loans Servicing, Inc. See at
Docket entry No. 52. 06/02/2010. Trustee English was Ordered to pay creditor's
attorney fees of $13,975 and Expenses of $388.87. These apparently remain
unpaid.

39.     In a supplemental Order, Docket No. 66, Sanctions were entered against English. Further, the properties that were placed in the Trust were apparently Ordered to be "changed in ownership." A copy of the ORDER is provided as Defendant's **Exhibit "10".**

39.     Subsequently, by **ORDER** of September 22, 2010, the Motion for Fees and Costs was increased to $23,975.00. The Judgment was made by the Court jointly and severally against the Emerald Bay Revocable Trust, Cheri English (the girlfriend), and Dennis L. Bell. The judgment apparently remains unpaid. A copy of the **ORDER** is provided as Defendant's **Exhibit "11".**

## F.     BELL'S DISCONCERTING BANKRUPTCY MATTER.

40.     The *Bell* Petition back in Kentucky was disposed of by Dismissal with Prejudice. Various creditors including *B AC Home Loans Servicing LP* and *Chase Home Finance LLC* apparently filed Objections to Discharge under Chapter 7 (alleged no-asset case), the trustee filed a Motion to Dismiss with Prejudice, and the Court Ordered (Docket Item 104, 10/26/2010) a Dismissal with Prejudice. *See*: Defendant's **Exhibit "6"**.

41.     Equally curious, although Bell represents to others in writing that he is the "majority stock holder" of the entity America's Wholesale Lender, Inc., the Schedules and Financial Statement of Bell in the cited Bankruptcy Petition seem to be devoid of any mention of these Holdings. *See*: Bell e-mail letter addressed to Attorney Diane Beall (California), dated September 22, 2011, 6:58 AM, reproduced at Defendant's **Exhibit "7".**

13

42.     The Bell Petition and Schedules are reproduced at Defendant's **Exhibit "15"**. The Documents seem to be filed with the Court on May 19, 2010. The *Petition* appears to represent the affairs of an impoverished man. There are no shares of stock or Corporate Directorships or Officer Appointments referenced.  The "Calculation of current monthly income" [see at pg. 45] reflects that his wages (earned income) from all sources is Zero, that his parents pay his health insurance premium, and that his girlfriend chips in $1,500 a month for his support.

43.     Nonetheless, Bell is listed as an "Officer" of the trucking company "DOUBLE D TRUCKING, INC.," together with the ubiquitous Miss English.  The Filings with the Kentucky Secretary of State list this enterprise as Organization Number 0762143, and is reproduced as Defendant's **Exhibit "16"**.  The "principal office" of the trucking fleet seems to be "1155 Smith Ave, Paducah, KY 42003," which turns out to be the house of "Betty Stucker," as noticed in **Exhibit "18"**.  What is disconcerting about DOUBLE D TRUCKING is that its Filings with the Secretary of State indicate a formal incorporation on April 30, 2010, yet no mention seems to be made in the Bankruptcy Petition Schedules or Statement of Financial Affairs of May 19, 2010.  The last page of the KY Filing shows Bell and English listing the same address, 2934 Benton Road, Paducah.

44.     Paralleling the above observations, Bell is listed as an "Officer" of the Kentucky entity WENDMERE FUNDING, LLC. , reproduced as Defendant's **Exhibit "18"**.  The entity was incorporated on April 09, 2010, apparently before the Bell Schedule filings in the bankruptcy court in Kentucky.  Bell is listed as the

only "Officer" of WENDMERE. The street address registered is again that of "Betty Stucker," at 1155 Smith Avenue, Paducah, Kentucky. Cheri English is listed as the "Organizer", although her credentials remain murky. "Wendmere Funding LLC," used by Bell for various identity-remote mortgage exercises, seems to remain unreferenced within the Bell Bankruptcy Schedules or Statement of Financial Affairs filed concurrently.

## G.    BELL'S LACK OF CANDOR WITH THE CALIFORNIA COURTS

45.    Although declarant Dennis Bell would have this Court believe that defendant is an "independent contractor" hired as some "Customer Service Representative" [*See*: Bell Declaration, ¶ 3], this is belied by a Filing that Bell made in the *Orange County Superior Court* on or about March 30, 2011. In this Filing, Bell simply inscribed the defendant's name onto the document, an act which can reasonably be construed by this Court as the forging of Van Eck's signature. A copy of that Filing, which included a Judgment, is at defendant's **Exhibit "19"**. The Court will observe that the Filing reflects "Maurits Van Eck" as the **"Senior Vice President"** of America's Wholesale Lender, Inc.

46.    The forged signature then has the "corporate seal" that Dennis Bell retains for is own use in Kentucky embossed over the signature. Lest there be any equivocation in the Court's mind that this is the "Bell seal," a copy of that "Seal" as used in a Bell document is produced at Defendant's **Exhibit "20"**. This page is the "last page" of Bell Declaration exhibit "A", page 6. The Court will

15

note that the writing style used in the forged signature of Maurits Van Eck is identical to that used by Bell himself in his own Exhibit "B", as is the Bell "Seal."

47. Also displayed in Defendant's **Exhibit "19"** is a copy of the Orange County "Notice and Acknowledgment of Receipt – Civil" of Service, commencing the Action. The mailing date is reflected as "3/25/2011." The acknowledgment date is reflected, in Bell's style of writing, as "March 29, 2011." The presumably-negotiated "Stipulated Judgment" is dated by Bell as the very next day, March 30, 2011. This would suggest that the entire exercise is a sham, orchestrated in advance. There is further no question that the funds that ensued to America's Wholesale Lender, Inc. pursuant to this exercise were wired into the "Bell"-controlled account in Metropolis, Illinois. Indeed, Maurits Van Eck knew nothing about this charade, his name, title and signature being deftly grafted onto the various documents by Dennis Bell.

48. Although at the time that Attorney Scott McKessy affixed his signature onto the Pleadings and Complaint, he knew that his client Dennis Bell was representing to the California Courts that defendant Van Eck was the "Senior Vice President" of America's Wholesale lender, Inc." (ironically, a representation that was truthful, albeit done by forged signatures). Nonetheless, McKessy would represent to this Federal Court in Connecticut that defendant was a mere "customer service representative," whatever that means. Indeed, as far as Defendant knows, there is no job category of "customer service representative" within the Company organization. It seems to be a convenient

fabrication to further the ends of this litigation.   Mr. McKessy is to be roundly condemned for attaching the imprimatur of Halloran and Sage to such charade.

49.    The Court's attention is directed towards the matter of *Wells Fargo Bank v. Bank of New York, et al.*, Docket No. CIV-DS-10-12544, as annexed hereto as defendant's **Exhibit "21"**.  In this bizarre case, it appears that homeowner ANDRE ROBINSON purchased a property in the County of San Bernardino, California, at 14321 Remington Court, Fontana 92336, on March 01, 2005.  Apparently thereafter, Robinson obtained financing, was declared in "default," and a "Notice of default" was fined by the entity "Countrywide Home Loans, Inc." on 07/03/2008.  Document # 2008-00301744 BK-PG.

50.    On September 30, 2009, in a Document executed in McCracken County, Kentucky, Dennis Bell created a "Substitution of Trustee and Full Reconveyance,"  removing Countrywide's "Chicago Title Company" as the recorded Trustee and inserting  AWL as both Trustee and Beneficiary on the same Instrument.

51.    On November 04, 2009, in a Document executed in McCracken County, Kentucky, Dennis Bell created a further and apparently duplicative "Substitution of Trustee and Full Reconveyance,"  removing Countrywide's "Chicago Title Company" as the recorded Trustee and inserting  AWL as both Trustee and Beneficiary on the same Instrument.

52.    On November 11, 2009, in a Document executed in Montgomery County, Tennessee, Dennis Bell created a *third*  "Substitution of Trustee and Full Reconveyance,"  removing Countrywide's "Chicago Title Company" as the

17

recorded Trustee and inserting AWL as both Trustee and Beneficiary on the same Instrument.

53.     On September 05, 2009, and notarized in San Bernardino County, CA on September 15, 2009, Andre Robinson executed a "Deed of Trust with Assignment of Rents" in favor of "America's Wholesale Lender, A New York Corporation" as beneficiary.  The Document was recorded upon the land records as Document NO. 2009-0404958 [see: Exhibit "21." ]

54.     The Property was then transferred to an entity styled as "Innovation Inc."

55.     The Property was then transferred into the "14231 Remington Court Trust."

57.     A fresh loan was placed on the property on November 09, 2009, from the Lender "Danco Inc.", and recorded on the Land Records.

58.     The "Trust" then sold the property to "Grant L. MacRorie," who then placed yet another fresh loan upon the Property, sourced from "Prospect Mortgage Inc." in a Recordation dated May 06, 2010.

59.     The "original trustee" filed a Notice of Sale on June 23, 2010, but is unable to exercise any Sale due to the intervening Assignments. From this, the cited litigation has erupted.

60.     Throughout all this, the Court can note that the address used on the "Deed of Trust with Assignment of Rents," San Bernardino Document # 2009-0404958, is an entity described as "Devine Financial, 846 Maplewood Road, Wayne, PA 19087."  Devine Financial is yet another of the Bell incorporations,

18

obviously active prior to the Bell bankruptcy declaration. Yet no mention seems to surface anywhere within the Bell Bankruptcy Schedules and the Statement of Financial Affairs reflecting his interests in "Devine Financial," this property, any other property, or much of anything else. Yet 846 Maplewood is a property appraised at $3,500,000 [See: defendant's **Exhibit "22"**], and control of the property is held either by Bell's "Devine Financial" or some successor to Devine Financial, Wendmere Financial. In essence, $3,500,000 seems to have conveniently vanished off the radar. Yet, Bell is offering this property for sale on Craigslist.

## H. AS TO THE 2ND BELL DECLARATION OF 29 SEPTEMBER 2011

61. The Bell Declaration of September 29, 2011 ("the 2nd Declaration) has no credibility. This document, manufactured and introduced by McKessy and signed by Bell, recites at some length the matter of "Celia Calco-Crawford" and the litigation in Orange County, California. Bell emphatically declares in his "Declaration" that {para. 7} "AWL was never aware of the Crawford Action and never participated in that action. ..." [See: Bell 2nd Declaration, ¶ 7].

62. This is belied by various Bell communications, including the two reproduced for the Court's inspection at defendant's **Exhibit "23"**. The first part of **"23"** shows an "e-mail" communication between Dennis Bell [describing himself as "massone99"] sent on April 20, 2011 to "Paul Nguyen," the person whom Bell represents is "conspiring" against him. It is undisputed that Nguyen is

19

in California.  The e-mail states clearly in the header that the "Subject" of the communication is "**Client - Crawford."**

63.     Equally disturbing, the gravamen of the e-mail message to Nguyen seems to suggest or infer that Bell is instructing Nguyen on how to manipulate the California Courts.  Note the comment of "My suggestion is to go ahead and **file the state court action** and <u>serve</u> the acknowledgment of service. ...[D]o the stip in state court and **get the judgment entered**. .... I **will do this one for you for 65K net.** ..."  [emphasis added].  It is not some arm's-length suit in Court; it is Bell instructing Nguyen to coach Beall on how to manipulate some suit through two parallel courts (County Court in California and the Federal Bankruptcy Court in California) so that the two, Bell and Nguyen, can split up the winnings.

64.     In the second page of Defendant's **Exhibit "23,"** appended, Bell as "massone99" sends an e-mail message to Paul Nguyen with the bank wiring information needed for the Crawford "deal."   It becomes clear that, notwithstanding the bald allegations of the 2nd Bell Declaration proffered to this Court by Attorney McKessy, in fact Bell was deeply enmeshed in the "Crawford" matter as far back as April 2011. Bell was also deeply enmeshed with his buddy Nguyen.

65.     With respect to the allegations regarding "Wells," Bell admits that no money has changed hands.  He declares that the "agreement" provides that $215,000. shall be paid to America's Wholesale Lender, not to the Defendant.  It becomes difficult to ascertain what the avenue of complaint is.  Bell then complains that a "proof of service" is signed by someone in Danville, Illinois. That

is not in Connecticut, and not by this Defendant; again, it is hard to reconcile these allegations with the bald representation by McKessy that the events underlying his *Complaint* are situated in Connecticut. Danville, upriver from Paducah, is 920 miles from Hartford, Connecticut.

66.    There is nothing in the 2nd Bell *Declaration* that invites credibility. McKessy through Bell claims that [¶ 13] "Defendant is not authorized to accept service on behalf of AWL." Yet Bell *himself* has represented to various Courts that defendant is the "Senior Vice President of America's Wholesale Lender, Inc." and has *himself* placed defendant's signature on proofs of service and then placed those documents into Court [*See*: Defendant's **Exhibit "19"**]. Any Officer of a Company is designated as appropriate for Service.

67.    The Court will note that these averments all come before this Court under the hand of Attorney Scott McKessy of Halloran and Sage. Together with the vast mounds of other paper with which McKessy has inundated this Court, precisely *none* of the representations made have anything to do with Connecticut and precisely *none* of the representations are truthful. McKessy has certain professional obligations to be candid and truthful to this Tribunal, and he has knowingly abused the trust and confidence that this Court would place in him. Coasting on the white-shoe reputation of Halloran and Sage, McKessy has procured utter rubbish and proffered it to this Court, manufactured by a seriously ill person with a demonstrated, indeed congenital, pattern of Findings of Misconduct before various Courts including multiple Federal Courts. McKessy is to be roundly condemned by this Court for his misconduct.

## H.    CONCLUDING OBSERVATIONS

68.    Defendant, cognizant of Bell's intention to render the Company insolvent and unable to pay creditors, and as an Officer of the Company, has declined to aid, administer, or assist in rendering the Company insolvent (and neither should the Courts). Presumably, as an Officer, Defendant herein may be found personally liable for the Company's debts after insolvency, when Bell takes flight with the Company funds, directs them to his fly-speck "bank" in cowpatch, Illinois, and disburses to himself and his interests, as has been his pattern in the past. Accordingly, Defendant has required that the Company through its Chairman and Chief Executive Officer, Tannenbaum in New York City, convene a Special Meeting of the Board of Directors and, should the Board so Resolve, then upon a verified copy of the Resolution the Defendant will send Company funds according to the dictates of that Resolution. Bell has refused to do so. Accordingly, Bell's maneuvers to render the Company insolvent are without Board approval.

69.    On or about October 03, 2008, Dennis Bell, the Declarant and underlying motivator for the litigation at bar, filed suit against his lenders in the United States District Court for the Western District of Kentucky (Paducah), under docket no. 5:08-cv-00167-JHM-ERG, styled as _Dennis Bell v. Countrywide Home Loans, Inc._. Notably, therein Dennis Bell named "America's Wholesale Lender, Inc." as a party Defendant. _See:_ Docket Sheet, pg. 2, at Defendant's **Exhibit "13"**.    Therein, at Item # 24, Dennis Bell entered a "Confession of Judgment by Defendant America's Wholesale Lender, Inc." In effect, Bell sued

22

himself and then entered a "confession of judgment" against himself. On February 04, 2009, the entire Action was Dismissed (Docket Item No. 48).

70.     The _Bell_ Complaint, reproduced at Defendant's **Exh. 13**, demonstrates the disturbing aspects of Bell's approach to our Courts. The _Complaint_ contains some 168 numbered paragraphs and 13 purported causes of action, all of which were dismissed.

71.     The Dismissal **ORDER** is reproduced at Defendant's **Exhibit "14"**. The **Memorandum Opinion and Order** [McKinley, J.] is unsettling in the recitations therein. The Court recites representations by the principal defendant, Countrywide Home Loans, that Bell has engaged in "questionable litigation tactics in state court;" that Bell "filed numerous frivolous Motions;" recites that Bell "was sanctioned by the McCracken Circuit Court for the unauthorized practice of law; deliberately gave false responses to written discovery requests; and engaged in at least eleven instances of perjury during his deposition testimony." _See_: ORDER at pg. 2.

72.     The **ORDER** further recites that "the Court cannot credit Bell's allegation..." the Court further cited Judge Clymer [{McCracken County Circuit Court, KY] in referring to Bell as:

"...A **'bald-faced liar'** after a long sanctions hearing in which Mr. Bell, , in fact, **lied _about his litigation history and credit score._"**

See at Def. **Exhibit "14".**

73. The Court is thus confronted with a Declarant, and substantively the plaintiff albeit couched through some Corporate mantle, who is profoundly mentally ill. Sadly, Dennis Bell is a deeply disturbed person, suffering from acute paranoia, absolutely convinced that demons from near and far are conspiring against him. Bell has no credibility before this nor any other Court. All his claims and cases have resulted in Dismissals, adverse actions, and Sanctions.

74. Distilled to its essence, the Court is confronted with one item: a cashier's check drawn by one "Linda Burk" to the payer "Chase Merritt Fund I, LLC." There is zero evidence that this check was ever endorsed, or otherwise became the property of, the named plaintiff herein. There is zero evidence that the funds that this cashier's check represents came into the hands of Defendant undersigned. There is zero evidence that this check ever left California. There may well be (and probably are) improprieties surrounding the circumstances of this check. The check itself was originally uncovered, ironically, by the Defendant, who sent a copy of it on to Dennis Bell. From there, Bell began his downward spiral into insanity and delusion.

75. Bell, clothing himself as a corporate "plaintiff", cannot be permitted to yet once again wreak harms, injuries, and losses upon the populace while he is acting out his paranoias and persecutory delusions, simply because, this time around, he has inveigled the respectability mantle of Halloran and Sage, the white-shoe law firm. Halloran and Sage should be ashamed of themselves. Mr. McKessy's client Mr. Bell needs a doctor and a hospital, not a courtroom. McKessy knows perfectly well his client is ill.

24

WHEREFORE. Defendant Motions this Court for the following relief:

1.     To Dismiss the Action with prejudice;

2.     To pay the Defendant his costs;

3.     Evidentiary hearing for imposition of Rule 11 Sanctions against

      Halloran and Sage, L.P.,

3.     Such other and further relief as this Honorable Court may find right,

      proper, just and equitable, in the circumstances that pertain.

BY THE DEFENDANT,

MAURICE VAN ECK
177 E. 77th St, NY NY
c/o DONOVAN and DONOVAN
    123 Elm Street
    Old Saybrook, CT 06475

For mailed items:
P.O. Box 16
Ivoryton CT 06442-0016
Tel: 347-291-6409

Certificate of Service
Certified served by deposit into mails or by hand delivery onto
Halloran and Sage,LLP, 225 Asylum Street, Hartford CT 06103,
On October 07, 2011:

Defendant

# TABLE OF CONTENTS

Exhibit 1:      Google Maps of 423 Ferry Street, Metropolis, Illinois

                Wikipedia description of Metropolis, Illinois

Exhibit 2:      Profile, City National Bank of Metropolis, Metropolis, Illinois

Exhibit 3:      Dennis Bell e-mail of Friday,  9/30/11, see pg 2, line 2-3  RE: New York

Exhibit 4:      Diane Beall e-mail of 9.23.11 regarding erasure of e-mails

Exhibit 5:      reserved for future use

Exhibit 6:      Docket Sheet, *In re Bell*, U.S.Bankr.Ct, W.D.KY (Paducah) 10-50501

Exhibit 7:      Bell e-mail of Thursday, 9/22/11 to Diane Beall

Exhibit 8:      Docket Sheet, *In re Emerald Bay Revocable Trust,* U.S.Bk.Ct. S.D.IL

Exhibit 9:      Transcript of Proceedings, U.S.Bk.Ct. S.D.IL. 11.3.10 *In re Emerald Bay*

Exhibit 10:     Minutes of Court, U.S.Bk.Ct. S.D.IL  *In re Emerald Bay*, July 28, 2010

Exhibit 11:     ORDER, *In re Emerald Bay,* U.S.Bk.Ct. S.D.IL 9/22/10

Exhibit 12:     Cheri English self-profile, filed on Internet.

Exhibit 13:     *Bell v. Countrywide Home Loans et al*, U.S.D.C., W.D.KY 08-cv-00167

Exhibit 14:     *Bell v. Countrywide*, MEMORANDUM OPINION AND ORDER, 02/04/09

Exhibit 15:     *In re Bell*, U.S.Bk.Ct., W.D.KY, docket and schedules, 10-50501

Exhibit 16:     Double D Trucking, LLC, Commonwealth of KY Reports.

Exhibit 17:     reserved for future use

Exhibit 18:     Wendmere Funding, LLC, Commonwealth of Kentucky Reports

Exhibit 19:     Judgment, Service Receipts, *In re Nguyen*, Orange Cty. Sup Ct., 3/30/11

Exhibit 20:     Copy, Bell signature and seal, from Bell *Declaration*, Exh. "A"

Exhibit 21:     *Wells Fargo v. Bank of New York et al*, San Bern. Cty Ct., Civ-DS1012544

Exhibit 22:     Appraisal, 846 Maplewood Avenue, Radnor Twp., PA

Exhibit 23:     Bell e-mail to Nguyen *in re Crawford*, 4.20.11; e-mail "wire" 4.14.11

# EXHIBIT

# 1



Google maps  Address **423 Ferry St**
                    **Metropolis, IL 62960**

Get Google Maps on your phone
Text the word "GMAPS" to 466453



# Metropolis, Illinois

From Wikipedia, the free encyclopedia

Coordinates: 37°9′12″N 88°43′31″W

**Metropolis** is a city located along the Ohio River in Massac County, Illinois, in the United States. As of the 2000 census, the city population was 6,482. It is the county seat of Massac County.[1] Metropolis is part of the Paducah, KY-IL Micropolitan Statistical Area and also located in Southern Illinois.

## Contents

- 1 History
- 2 In popular culture
- 3 Geography
- 4 Demographics
- 5 Transportation
- 6 Healthcare
- 7 Notable people
- 8 Metropolis vs. Smallville
- 9 Superman references
- 10 See also
- 11 Footnotes
- 12 External links

## History

Located on the Ohio River, the Metropolis area has been settled by many different peoples over history. For thousands of years, varying cultures of Native Americans originally populated the area. The most complex society was the Mississippian culture, which reached its peak out 1100 AD and built a large city at Cahokia, near present-day Collinsville, Illinois. Its people built large earthworks and related structures, many of which remain at the UNESCO World Heritage Site. Mississippian culture regional centers arose throughout the Ohio and lower Mississippian valleys, where the rivers were part of widespread trading routes.

In 1757, Massac County was settled by a French expedition, which built Fort De L'Ascension for use during the French and Indian War (also known as the Seven Years War. The forces at the fort were able to resist a Cherokee attack during the war. Afterward the defeated French abandoned the fort. When the victorious British came to possess territory ceded by the French,

| Metropolis | |
|---|---|
| City | |



Elijah P. Curtis House in Metropolis

| | |
|---|---|
| **Country** | United States |
| **State** | Illinois |
| **County** | Massac |
| **Coordinates** | 37°9′12″N 88°43′31″W |
| **Area** | 5.1 sq mi (13 km²) |
| - land | 5.1 sq mi (13 km²) |
| **Density** | 1,295.1 / sq mi (500 / km²) |
| **Timezone** | CST (UTC-6) |
| - summer (DST) | CDT (UTC-5) |
| **Postal code** | 62960 |
| **Area code** | 618 |

the Chickasaw had already destroyed the fort.

Its mostly ethnic French residents were sympathetic to the rebels. In 1794 General George Washington ordered Fort Massac reconstructed. The fort was severely damaged by the New Madrid earthquake of 1811-12, and was abandoned by US military forces in 1 and left little behind of the original construction materials.

He picked the site because it was high above the river. In 1843, the Illi McCartney family became leaders in building the town.

Prior to the American Civil War, some groups worked to establish a W present-day Metropolis and the nearby area of Kentucky. An 1850 ma encamped in the vicinity during the early years of the American Civil W more farmers held slaves than in other parts of the state, as this section South, the state stayed with the Union during the war.



Metropolis is also home to Harrah's Metropolis casino/hotel, a riverboa the region, making tourism one of the city's largest industries. Metropoli Hexafluoride Processing Facility, which converts milled uranium into uranium hexafluoride for possible additions.[2]

# In popular culture

- On January 21, 1972 DC Comics declared Metropolis the "Hometown of Superman".
- On June 9, 1972 the Illinois State Legislature passed Resolution 572 that declared Metropolis the "Hometown of Superman," the comic book superhero who is based in the fictional city of Metropolis.[3]
- The city has erected a large Superman statue, and fans created a small Superman museum. The city holds an annual Superman Celebration held the second weekend in June.
- The local newspaper is named *The Metropolis Planet (http://www.MetropolisPlanet.com)* , inspired by *The Daily Planet*, the fictional paper in Superman's Metropolis.

# Geography

Metropolis is located at 37°9′12″N 88°43′31″W (37.153332, -88.725374).[4]

According to the United States Census Bureau, the city has a total area of 5.1 square miles (13.1 km²), of which, 5.0 square miles (13.0 km²) of it is land and 0.1 square miles (0.2 km²) of it (1.18%) is water.

# Demographics

As of the census[5] of 2000, there were 6,482 people, 2,896 households, and 1,708 families residing in the city. The population density was 1,295.1 people per square mile (499.5/km²). There were 3,265 housing units at an average density of 652.3 per square mile (251.6/km²). The racial makeup of the city was 90.53% White, 7.61% African American, 0.20% Native American, 0.20% Asian, 0.45% from other races, and 1.02% from two or more races. Hispanics or Latinos of any race were 0.74% of the population.

There were 2,896 households out of which 24.4% had children under the age of 18 living with them, 43.6% were

EXHIBIT

2



**Banks**

*US Bank Profiles*

faqs.org » Banks

Bank Search:

[                    ] [ Search ]

faqs.org

# The City National Bank of Metropolis in Metropolis, Illinois (IL)



The City National Bank of Metropolis routing number info

**Table of contents:**

- Overview:
  - General
  - Location
  - History of Changes
  - Financial

- Detailed Financial Reports:
  - Assets and Liabilities
  - Income and Expense

- ○ Performance and Condition Ratios
- **All branches (2):**
  - ○ Illinois branches (2)

### The City National Bank of Metropolis

|  |  |
|---|---|
| General | **FDIC Certificate #:** 3814 |
|  | **Status:** Active |
|  | **Federal Reserve ID:** 298245 |
|  | **Bank Holding Company (Regulatory Top Holder):** City National Bankcorp, Inc. (RSSDID: 1129672, Location: Metropolis, IL) |
|  | **Date Established:** July 01, 1908 |
|  | **WWW:** http://www.cnb-metropolis.com |
|  | **Trust Powers Granted:** Yes |
|  | **Bank Charter Class:** Commercial bank, national (federal) charter and Fed member, supervised by the Office of the Comptroller of the Currency (OCC) |
|  | **Offices:** 2 (Domestic: 2, Interstate: No) |
|  | **OTS Docket #:** 13107 |
|  | **FDIC's unique #:** 2475 |
|  | **Numeric code:** 3 |
|  | **Regulator:** OCC |
|  | **Insurance Fund Membership:** Deposit Insurance Fund (DIF) |
|  | **Insured commercial Banks:** Yes |
|  | **FDIC Insured:** Yes |
|  | **Deposit Insurance Fund member:** Yes |
|  | **Ownership Type:** Non-Stock |
|  | **FFIEC Call Report 31 Filer:** No |
|  | **State Chartered:** No |
|  | **Subchapter S Corporations:** No |
|  | **Asset Concentration Hierarchy:** All Other Specialization < 1 Billion |
|  | **Date of Deposit Insurance:** January 01, 1934 |
|  | **Last Structure Change Effective Date:** March 31, 2006 |
|  | **Last Structure Change Process Date:** November 03, 2006 |
|  | **Last Data Update:** November 03, 2006 |
|  | **Data Source Date:** Febuary 17, 2011 |

|  |  |
|---|---|
| Location | **Address:** 423 Ferry Street, Metropolis, IL 62960 |
|  | **County:** Massac |
|  | **Quarterly Banking Profile Region:** Chicago |
|  | **FDIC Geographic Region:** Chicago |
|  | **FDIC Supervisory Region:** Chicago |
|  | **FDIC Field Office:** Mount Vernon |
|  | **Office of the Comptroller the Currency (OCC) District:** Central |
|  | **Office of Thrift Supervision Region:** Central |
|  | **Combined Statistical Area (CSA):** Paducah-Mayfield, KY-IL (#424) |
|  | **Core Based Statistical Area (CBSA):** Paducah, KY-IL (#37140) |
|  | **CBSA Micro Statistical Area:** Yes |

|  |  |
|---|---|
| History of Changes | Merge BIF and SAIF Funds into DIF |

**Total assets:** $26.8 mil
**Equity capital:** $3.4 mil

Financial Summary

**Deposits held in domestic offices:** $20.1 mil
**Return on assets (ROA):** 1.01.2021% ($0.3 mil)
**Quarterly return on assets:** 1.01.1940% ($0.3 mil)
**Return on Equity (ROE):** 1.09.1943% ($0.0 mil)
**Quarterly return on equity:** 1.10.1990% ($0.0 mil)
**Net income:** $0.2 mil
**Quarterly Net income:** $0.9 mil
**Pretax return on assets:** 1.01.1963% ($270.6 mil)
**Quarterly Pretax return on assets:** 1.01.1991% ($270.6 mil)



1992 - 1999 Historical total assets, liabilities and capital ($ mil)



2000 - 2010 Historical total assets, liabilities and capital ($ mil)









| Assets and Liabilities (December 31, 2010) (Dollar figures in thousands) | |
|---|---|
| **Total employees (full-time equivalent)** | **42** |
| **Total assets** | **$278,172** |
| Cash and due from depository institutions | $4,399 |
| Interest-bearing balances | $531 |
| Securities | $131,995 |
| Federal funds sold & reverse repurchase agreements | $0 |
| Net loans & leases | $135,148 |
| Loan loss allowance | $2,147 |
| Trading account assets | $0 |
| Bank premises and fixed assets | $2,312 |
| Other real estate owned | $69 |
| Goodwill and other intangibles | $0 |
| All other assets | $4,249 |
| Life insurance assets | $0 |
| **Total liabilities and capital** | **$278,172** |
| Total liabilities | $246,418 |
| Total deposits | $214,604 |
| Interest-bearing deposits | $198,890 |
| Deposits held in domestic offices | $214,604 |
| % insured (estimated) | 88.41% |
| Federal funds purchased & repurchase agreements | $8,162 |
| Trading liabilities | $0 |
| Other borrowed funds | $22,759 |
| Subordinated debt | $0 |
| All other liabilities | $893 |
| Total equity capital | $31,754 |

| | |
|---|---|
| Total bank equity capital | $31,754 |
| Perpetual preferred stock | $31,754 |
| Common stock | $0 |
| Surplus | $400 |
| Undivided profits | $400 |
| **Memoranda** | |
| Noncurrent loans and leases | $30,954 |
| Noncurrent loans that are wholly or partially guaranteed by the U.S. government | $14,507 |
| Income earned, not collected on loans | $0 |
| Earning assets | $2,473 |
| Long-term assets (5 + years) | $0 |
| Average Assets, year-to-date | $1,689 |
| Average Assets, quarterly | $267,674 |
| Volatile liabilities | $134,481 |
| Insider loans | $257,197 |
| FHLB advances | $273,032 |
| Loans and leases held for sale | $28,419 |
| Unused loan commitments | $2,478 |
| Tier 1 (core) risk-based capital | $22,759 |
| Tier 2 risk-based capital | $0 |
| Total risk weighted assets | $0 |
| Total unused commitments | $14,507 |
| Restructured Loans and leases | $1,157 |
| Derivatives | $1,716 |

Back to page top, Back to table top

| Income and Expense (December 31, 2010) (Dollar figures in thousands) | |
|---|---|
| Total interest income | $12,244 |
| Total interest expense | $3,956 |
| Net interest income | $8,288 |
| Provision for loan and lease losses | $750 |
| Total noninterest income | $860 |
| Fiduciary activities | $0 |
| Service charges on deposit accounts | $485 |
| Trading account gains & fees | $0 |
| Additional noninterest income | $375 |
| Total noninterest expense | $4,442 |
| Salaries and employee benefits | $2,437 |
| Premises and equipment expense | $436 |
| Additional noninterest expense | $1,569 |

| | | |
|---|---|---|
| Pre-tax net operating income | | $3,956 |
| Securities gains (losses) | | $484 |
| Applicable income taxes | | $1,229 |
| Income before extraordinary items | | $3,211 |
| Extraordinary gains - net | | $0 |
| **Net income attributable to bank** | **$3,211** | |
| Net charge-offs | | $0 |
| Cash dividends | | $3,211 |
| Sale, conversion, retirement of capital stock, net | | $330 |
| Net operating income | | $984 |

Back to page top, Back to table top

| Performance and Condition Ratios (December 31, 2010) | |
|---|---|
| (Dollar figures in thousands) | |
| **Performance Ratios (%, annualized)** | |
| Yield on earning assets | 4.96% |
| Cost of funding earning assets | 1.60% |
| Net interest margin | 3.36% |
| Noninterest income to earning assets | 0.35% |
| Noninterest expense to earning assets | 1.80% |
| Net operating income to assets | 1.11% |
| Return on assets (ROA) | 1.25% |
| Pretax return on assets | 1.73% |
| Return on equity (ROE) | 9.95% |
| Retained earnings to average equity (YTD only) | 6.90% |
| Net charge-offs to loans | 0.25% |
| Credit loss provision to net charge-offs | 227.27% |
| Efficiency ratio | 14.26% |
| Assets per employee | $48,557 |
| Cash dividends to net income (YTD only) | 6.62% |
| **Condition Ratios (%)** | |
| Loss allowance to loans | 30.64% |
| Loss allowance to noncurrent loans | 1.56% |
| Noncurrent assets plus other real estate owned to assets | 86.82% |
| Noncurrent loans to loans | 0.91% |
| Net loans and leases to deposits | 1.80% |
| Net loans and leases to core deposits | 62.98% |
| Equity capital to assets | 69.54% |
| Core capital (leverage) ratio | 11.42% |
| Tier 1 risk-based capital ratio | 11.70% |
| Total risk-based capital ratio | 22.46% |

Memoranda

Memoranda

| | |
|---|---:|
| Average assets | $24 |
| Average earning assets | $257,197 |
| Average equity | $32,276 |
| Average loans | $247,031 |

Back to page top, Back to table top

| 2 Illinois Branches as of Febuary 17, 2011 | | | | | |
|---|---|---|---|---|---|
| No ↑ | ID | Name | Address | Established | Service Type | Map |
| 0 | 2475 | The City National Bank Of Metropolis | 423 Ferry Street, Metropolis, IL 62960 | July 01, 1908 | Full Service Brick and Mortar | 📍 |
| 1 | 444390 | I-24 Branch | 2070 East 5th Street, Metropolis, IL 62960 | September 01, 2005 | Full Service Brick and Mortar | 📍 |

Back to page top



Recent posts about Personal Finance on our forum with over 1,200,000 registered users:

- ○ **Credit score system, unfair and way too strict** (143 replies)
- ○ **Bank Debit Card Fees** (160 replies)
- ○ **friends loan** (6 replies)
- ○ **Who is at fault for BoA raising fees?** (9 replies)
- ○ **How the lottery is a tax on the stupid.** (34 replies)
- ○ **Loan or credit card for dental work?** (9 replies)

Based on public records. Inadvertent errors are possible.
Faqs.org does not guarantee the accuracy or timeliness of any information on this site.  Use at your own risk.

Some parts © 2011 Advameg, Inc.

# EXHIBIT

# 3